Howard A. Fischer (HF 8582)
Daniel E. Shaw (DS 8129)
Matthew A. Katz (MK 4252)
Schindler Cohen & Hochman LLP
100 Wall Street, 15th Floor
New York, New York 10005
(212) 277-6300 (tel)
(212) 277-6333 (fax)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
CASHCALL, INC. and                                  :
DR. J. PAUL REDDAM,                                 :    07 Civ. 7332(JGK)
                                                    :
             Plaintiffs,                            :
                                                    :
    -against-                                       :    **COMPLAINT**
                                                    :
CIGPF I CORP.,                                      :
                                                    :
             Defendant.                             :
---------------------------------------------------------x

Plaintiffs CashCall, Inc. ("CashCall") and Dr. J. Paul Reddam (collectively, "Plaintiffs"), by their attorneys Schindler Cohen & Hochman LLP, for their Complaint against Defendant CIGPF I Corp. ("CIGPF") allege as follows upon knowledge as to their own acts and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1.    This is an action for declaratory and injunctive relief, and for damages relating to CIGPF's deliberate breach of its contractual obligations, as well as CIGPF's deliberate attempts to destroy Plaintiffs' business.

## PARTIES

2.    CashCall is a corporation organized under the laws of the State of California with its principal place of business at 17360 Brookhurst Street, Fountain Valley, California 92708.

{00033176}

CashCall is engaged in the business of consumer finance lending and provides unsecured installment loans to individual borrowers.

3. Dr. J. Paul Reddam ("Reddam") is an individual residing in Sunset Beach, California. Reddam has over 20 years of experience in the finance lending industry. Currently Reddam serves as the President and Chief Executive Officer of CashCall, Inc.

4. CIGPF is a corporation organized under the laws of the State of New York with its principal place of business at 390 Greenwich Street, New York, New York 10013. CIGPF is a wholly-owned subsidiary of Citigroup.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is an action between citizens of different states and the matter in controversy exceeds $75,000.

6. Pursuant to 28 U.S.C. § 1391, venue is properly laid in the United States District Court for the Southern District of New York. Furthermore, venue is proper because the parties contractually agreed to have any disputes heard by the federal courts in New York County.

## FACTS

7. CashCall is a consumer finance company that provides unsecured installment loans to individual customers. It offers personal loans that are not secured by personal property or collateral like a home or car to individuals in amounts typically under ten thousand dollars.

8. CashCall obtains the capital it requires in order to make its consumer loans from two credit facilities, a senior facility and a junior facility. For every one of CashCall's consumer loans, the bulk (up to 90%) of the capital is provided by the senior facility, with the residual amount of approximately 10% provided by the junior facility.

9. The senior facility, of up to $1 billion, is provided by a syndicate of Class A and Class B Lenders led by Deutsche Bank Securities Inc. ("DBSI"), and is governed by a Second Amended and Restated Loan and Security Agreement dated as of June 8, 2006, among CashCall and various other parties (the "Senior Loan Agreement"). CIGPF is a Class B Lender under the Senior Loan Agreement.

10. The junior facility, also referred to as the residual facility, is governed by a Note Purchase Agreement, dated as of September 25, 2006, between CashCall, Inc. and Deutsche Bank Securities Inc., as predecessor in interest to CIGPF (the "NPA"). Shortly after the NPA was executed, CIGPF succeeded to DBSI's interest in the NPA. Pursuant to the NPA, CIGPF provided a residual facility of $30 million, and two other parties, The Patriot Group LLC ("Patriot Group") and SageCrest II, LLC ("SageCrest"), two lenders under the Senior Loan Agreement, provided an additional $10 million each, for a total of $50 million.

11. Under the terms of the Senior Loan Agreement, funds received on the underlying consumer loans are processed through what is referred to as a "waterfall." Every month, the money received by CashCall from borrowers first goes to DBSI, which deducts from that amount its interest and other earned fees. The remaining funds then go to The Bank of New York, which is the administrative agent under the Senior Loan Agreement. On the 15th of each month, The Bank of New York remits these funds to an account controlled by CIGPF, known as the Purchaser/Wells Pledged Deposit Account, from which CIGPF can deduct from that deposited sum any interest due to it under the NPA that had not previously been paid by CashCall. CIGPF is then supposed to immediately remit the remainder back to CashCall.

12. By its terms, the NPA was set to expire on September 27, 2007. In April 2007, Reddam called Ari Rosenberg ("Rosenberg"), Vice President and Treasurer of CIGPF, to discuss

extending the residual facility past its September 27, 2007 maturity date. Rosenberg told Reddam it was too early to start discussions on this matter and asked him to call back in June.

13. On June 4, 2007, Reddam called Rosenberg to discuss the renewal of the residual facility. Rosenberg agreed to visit CashCall in California some time in June or July to begin negotiations on renewing the facility.

14. During this phone call, Reddam also advised Rosenberg that DBSI was in the process of putting together an amendment to the Senior Loan Agreement to clarify certain terms. Rosenberg welcomed the amendment because he had previously opined that certain definitions in the Senior Loan Agreement were vague and should be clarified. Rosenberg told Reddam that he would like the amendment to contain a cap on loan modifications, and Reddam agreed that this was a good idea and that he would ask DBSI to include such a cap.

15. On or about June 11, 2007, DBSI's counsel circulated a draft of the Fourth Amendment to the various Class A and Class B Lenders (including Rosenberg at CIGPF).[1] This draft contained the modification cap that Rosenberg had requested. The draft also stated that the amendment would become effective:

> [U]pon receipt by the Collateral Agent of (a) counterparts of this Amendment (whether by facsimile or otherwise) executed by each of the parties hereto and the Required Class A Lenders and Required Class B Lenders, provided that the amendment to Section 17.1 shall only become effective if all the Class A Lenders and Class B Lenders execute this Amendment.

Notably, the Senior Loan Agreement defines "Required Class A Lenders" and "Required Class B Lenders" as those parties holding at least two-thirds of Class A and Class B interests.[2] The two-

---

[1] The Fourth Amendment was implemented to clear up various definitions in the Senior Loan Agreement and to protect the lenders by placing caps on the number of loan modifications CashCall could make. It also amended the delinquency triggers to account for changes in the composition of the loan portfolio.

[2] CIGPF holds $20 million in Class B interests, which amounts to 16% of the Class B total.

thirds requirement is consistent with Section 18.2 of the Senior Loan Agreement, which requires unanimous lender consent only when certain enumerated provisions were modified. The Fourth Amendment modified only one of those terms (the indemnification provision), so only that particular element of the amendment required unanimous consent. The other modifications did not implicate the other terms requiring unanimous consent, so only two-thirds approval was required to effectuate those changes.

16.  Over the next six weeks, DBSI's counsel circulated at least seven additional drafts of the Fourth Amendment, each of which incorporated terms prompted by concerns voiced by various members of the lending group. Rosenberg received a copy of each draft, and each draft contained the same language regarding the Fourth Amendment's effectiveness upon two-thirds consent from the Required Class A Lenders and the Required Class B Lenders. Throughout this period, DBSI made several calls to all of the lenders to gather feedback and to ask whether the lenders were prepared to sign the amendment. DBSI had advised CashCall that they had made numerous calls to Rosenberg to discuss the amendment, but that he was "totally unresponsive." Rosenberg failed to return dozens of calls and e-mails. DBSI called him daily to get his thoughts on the Fourth Amendment but got no response.

17.  In mid-July of 2007, one of the members of the senior loan facility syndicate called CashCall and questioned whether we had obtained an opinion as to whether the subject matter of the amendment would require consent of only two-thirds of the lenders, as opposed to unanimous consent. CashCall asked the law firm of Greenberg Traurig, LLP ("GT") to examine the issue. GT confirmed that the Senior Loan Agreement allowed the Fourth Amendment to become effective with two-thirds approval and issued an opinion to that effect. DBSI's counsel, which drafted the Fourth Amendment, concurred with this opinion.

18.     To be safe, CashCall circulated the draft opinion to all of the lenders on July 19, 2007, and received no response from anyone. By the week of July 23, 2007, the Fourth Amendment was now in final form. GT issued the final opinion on July 25, 2007, which was again circulated to each of the lenders. Again, no comments or responses were forthcoming from CIGPF or anyone else.

19.     On or about July 26, 2007, Reddam called Rosenberg to discuss renewal of the residual facility. Rosenberg said he would come to California the following week to discuss the matter. Rosenberg did not bring up the Fourth Amendment in this call, or in a follow-up call on July 30, 2007 to confirm his upcoming August 2, 2007 trip to California.

20.     On July 31, 2007, as DBSI was calling all of the lenders to collect signatures, Rosenberg called Reddam to say that he had just then looked at the Fourth Amendment for the first time, and while he did not have any problems with the content, he felt it was "very aggressive" to take the position that the Fourth Amendment required only two-thirds approval. After some back and forth, Rosenberg stated on a call with Adam Cohen and Michael Chang of DBSI, Reddam, and Daniel Baren ("Baren"), CashCall's General Counsel, that he would sign the Fourth Amendment and put his signature in escrow for three days. He said he would release the signature on August 3 as long as he did not discover any major problems when he visited CashCall on August 2. Rosenberg was advised that the Fourth Amendment was going to close on July 31, 2007, so that it would be in effect as of the end of the month.

21.     At that point, the holders of at least two-thirds of the Class A and Class B interests had signed the Fourth Amendment, thereby allowing it to close even without CIGPF's signature. This was important because the new triggers and definitions contained in the Fourth Amendment would apply to the July loan performance data. Rosenberg voiced no objection.

{00033176}

CashCall and DBSI (as well as the other lenders) considered the Fourth Amendment closed as of July 31, 2007. The execution copy was dated as of July 13, 2007.

22. On August 1, 2007, after the Fourth Amendment became effective, Rosenberg notified DBSI and CashCall that he was not going to sign the Fourth Amendment yet and would decide as to whether he would sign after his visit to CashCall. On August 2, 2007, Rosenberg visited CashCall, and spent approximately six hours in friendly discussions with Reddam and Baren. During these meetings, the subject of the Fourth Amendment did not come up.

23. With respect to the residual facility, Rosenberg advised that while it was possible that CIGPF would renew the line, it was very unlikely that they would expand it based on the larger problems in the subprime market. That same day, CashCall reached an agreement with Patriot Group on a deal to lend CashCall $6,000,000 to fund a deposit account CashCall is required to maintain at First Bank of Delaware (the federally regulated bank that funds loans originated by CashCall in several states).

24. On August 6, 2007, Reddam received a call from John Kane ("Kane") and Chuck Forbes ("Forbes") of Patriot Group telling him that Rosenberg called them "on the war path." Forbes and Kane both told Reddam that Rosenberg said he was going to "look for an excuse to put CashCall in default" on the residual line. Forbes and Kane also told Reddam that Rosenberg was attempting to poison the well by stating that the loss curves on CashCall's loans in the senior facility were far worse than anybody thought.

25. On August 7, 2007, Reddam received a call from Adam Cohen at DBSI telling him that Rosenberg had called both Patriot Group and SageCrest wherein he exaggerated delinquencies and painted a very negative picture of the loan portfolio. Cohen told Reddam that he believed Rosenberg was trying to sabotage any deals with Patriot Group and SageCrest and

trying to intimidate them against renewing their portions of the residual line. Cohen told Reddam that he knew that Rosenberg had made the calls to Patriot Group and SageCrest because the principals at those firms called him to report the calls.

26. The next day, Reddam called Rosenberg and asked why he would try to intimidate CashCall's lenders. Rosenberg admitted that this was his goal, but stated that "there is no scaring SageCrest because they have their eyes closed." Rosenberg stated that he was "livid" at DBSI for pushing through the Fourth Amendment without his consent. During this call, and for the first time, Rosenberg told Reddam that CIGPF had decided not to renew the residual facility.

27. On August 9, 2007, a representative of Patriot Group called Reddam and explained that CIGPF had intimidated them against following through with funding the First Bank of Delaware Deposit Account, as previously agreed. CashCall was thus forced to use its own cash to fund the deposit account. The same day, CashCall's General Counsel, Daniel Baren, asked The Bank of New York to confirm the date that the Fourth Amendment went into effect. The Bank of New York deferred to counsel, which confirmed in an e-mail that the effective date was July 13, 2007.

28. On August 10, 2007, Reddam received a call from Rob Leeds at Silar Investments (another Class B Lender). Leeds told Reddam that Rosenberg had called him to complain that DBSI had enacted the Fourth Amendment without CIGPF's consent. Leeds said that Rosenberg was saying very negative things about CashCall regarding delinquencies and defaults, and that it was clear that "Ari [Rosenberg] is not your friend."

29.     At the time he made these calls, Rosenberg knew that Silar Investments and CashCall had been discussing various potential financing arrangements – any one of which would have provided the capital to pay off the residual facility.

30.     On August 13, 2007, Reddam held a conference call with all of the lenders (including Rosenberg) to discuss CashCall's situation. During the call, Reddam explained that CashCall's immediate goal was to find a way to raise the capital to pay off CIGPF on the residual facility's maturity date, September 27, 2007. Reddam explained that CashCall was actively pursuing three distinct options: (i) borrowing $50-$100 million from Capital Source Finance LLC or Morgan Stanley Asset Funding Inc.; (ii) selling $100 to $200 million of loans to Silar Investments; or (iii) selling some or all of the equity in CashCall.

31.     During this call, Adam Cohen of DBSI talked about the Fourth Amendment and expressly asked if any of the lenders took the position that the Fourth Amendment did not go into effect in July. Nobody protested. While Rosenberg was very active on the call and made several comments about other issues, he was silent when asked this question.

32.     On August 14, 2007, CashCall received a term sheet from Silar Investments to buy a minimum of $100 million of CashCall's loans. CashCall spent a good portion of the day negotiating the deal with Rob Leeds. By the end of the day, the parties had agreed on all major terms and were going to spend the next day working out minor details in an attempt to fund the transaction within the next week.

33.     However, on August 15, 2007, Rosenberg, on behalf of CIGPF, sent letters (attached as Exhibits E and F to the August 16, 2007 Declaration of Daniel H. Baren, Esq.) to Reddam and CashCall alleging that, as a result of the enactment of the Fourth Amendment, CashCall was in default under the NPA and that, as guarantor pursuant to a certain September

25, 2006 Guaranty (the "Guaranty"), Reddam is personally required to satisfy the outstanding obligations of CashCall to CIGPF, amounting to over $50 million. It should be noted that the interest rate applied to defaults under the NPA is 25%. No doubt CIGPF considered this added benefit in claiming that CashCall is in default.

34. CIGPF sent copies of these letters to Patriot Group, SageCrest, Morgan Stanley Asset Funding Inc., and Capital Source Finance LLC. The reasons set forth in the letters are without support and are clearly pretextual.

35. Neither Capital Source nor Morgan Stanley were previously lenders in the senior or junior facilities; though they were both looking to invest and perhaps take over the junior facility from CIGPF. In the wake of these letters, Capital Source and Morgan Stanley have become reticent to move forward. Nor is CashCall in a position to continue equity discussions, and Silar Investments has apparently walked away from the loan purchase deal.

36. CIGPF also now refuses to abide by the Senior Loan Agreement's waterfall payment scheme. On August 13, 2007, CashCall paid all the interest then owing to CIGPF, and nothing more was due. Approximately $6,063,000 was left in that month's Purchaser/Wells Pledged Deposit Account once DBSI had taken out all sums owed it. However, when on August 15, 2007 Bank of New York sent the sums to CIGPF, notwithstanding that no funds were owed it, CIGPF failed to remit the remaining $6,063,000 to CashCall. Instead, CIGPF kept the entire amount in contravention of the Senior Loan Agreement. Notably, the $6,063,000 included approximately $980,000 in servicing fees that would be owed to CashCall even if CashCall had been in default – which it was not.

37. CIGPF not only seeks to wrongfully keep this $6,063,000 in funds owed to CashCall, but at the same time, CIGPF is attempting to accelerate all sums owed under the NPA, and seek a way out of its positions in the consumer finance market.

38. On Monday, August 20, 2007, CashCall is supposed to receive $825,000 as excess interest from the collections received or payments made by borrowers whose loans are financed by Capital Source, on the basis of a prior agreement between Plaintiffs and Capital Source.[3] As in the NPA, this money goes through CIGPF, which takes out its weekly interest due on the residual line and remits the rest to CashCall. Without judicial relief, it is likely, if not certain, that CIGPF will abscond with these funds as well. This is a continuing harm as these payments are due on a weekly basis and range in amount from $500,000 to $3 million.

39. Because of CIGPF's actions, CashCall has suffered and will continue to suffer significant harms, including:

    a. CashCall cannot fund any new loans;

    b. CashCall will be forced to effect wide-ranging staff layoffs as of Friday, August 17, 2007 because it cannot meet its employee payroll obligations;

    c. CashCall will be unable to properly service the $700 million of loans in its portfolio, which in turn will result in massive quantities of delinquencies and defaults;

    d. CashCall has lost, and will continue to lose, financing opportunities;

    e. CashCall will not be able to pay the costs associated with collections on its loans;

---

[3] The Capital Source facility is governed by the Secured Liquidating Loan Facility dated as of April 25, 2005, among Capital Source Financing LLC, CashCall Receivables Trust, as Borrower, and lenders identified therein.

f.  CashCall will not be able to fund loans for which it has already committed to borrowers with promissory notes, thereby potentially subjecting it to claims of damages by those borrowers;

g.  CashCall has had to shut down its website and stop taking loan applications;

h.  Dozens of employees have already walked out, and CashCall's loan servicing employees are so concerned about whether they will be paid that they are unable to focus on the job of servicing loans in a $700 million portfolio;

i.  By declaring a Default (as defined in the NPA), CIGPF has created the circumstances under which the other lenders can likewise declare a Default, which will eliminate all further loan activity and allow them to employ a variety of draconian remedies against Plaintiffs;

j.  CIGPF's action will force CashCall to conduct a firesale of its business to avoid a complete collapse, thereby eviscerating most of the recent $530-$710 million valuation CashCall received last week; and

k.  CIGPF's defamation destroys the goodwill and cripples the lending portfolio Plaintiffs have spent several years developing, and the resulting reputational damage imperils CashCall's ability to obtain any future loan facilities.

## COUNT I

### (CONVERSION)

40. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-39 above, as if set forth fully herein.

41. The $6,063,000 in Collateral (as defined in the NPA) that was wrongly appropriated by CIGPF from the Purchaser/Wells Pledged Deposit Account constitutes a specifically identifiable fund of money that CIGPF was under a contractual duty, per the waterfall payment scheme of the Senior Loan Agreement, to leave for CashCall.

42. CIGPF's appropriation of the $6,063,000 of Collateral belonging to CashCall is an unauthorized exercise of control over CashCall's property by CIGPF which interferes with, and is in defiance of, CashCall's superior possessory right in that property.

43. CashCall has demanded that CIGPF remit the $6,063,000 owed to CashCall, and CIGPF has refused to comply with that demand.

44. CIGPF has therefore converted specific funds from the Purchaser/Wells Pledged Deposit Account in the amount of $6,063,000 rightfully belonging to CashCall.

45. CIGPF's actions have damaged Plaintiffs in an amount to be determined at trial, but in any event not less than $6,063,000, plus statutory interest and attorney's fees.

## COUNT II

### (TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONS)

46. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-45 above, as if set forth fully herein.

47. Plaintiffs enjoyed current and prospective business relations with multiple entities, including The Patriot Group, LLC, SageCrest Holdings Limited, SageCrest II, LLC, Morgan Stanley Asset Funding Inc., and Capital Source Finance LLC.

48. CIGPF's August 15, 2007 letter, along with the numerous false and defamatory statements made by CIGPF's agent, constituted clear interference by CIGPF with the business relationships between Plaintiffs and the other entities listed above. CIGPF sent the August 15, 2007 letter and made the false and defamatory statements to these other entities for the sole purpose of harming Plaintiffs. In so doing, CIGPF employed unfair, dishonest, and improper means.

49. CIGPF's conduct has injured the business relationships between Plaintiffs and the other entities, including The Patriot Group, LLC, SageCrest Holdings Limited, SageCrest II, LLC, Morgan Stanley Asset Funding Inc., and Capital Source Finance LLC.

50. CIGPF's actions have damaged Plaintiffs in an amount to be determined at trial of up to $600 million, but in any event not less than $6,063,000, plus statutory interest and attorney's fees.

## COUNT III

### (DECLARATORY JUDGMENT)

51. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-50 above, as if set forth fully herein.

52. As a party to the Note Purchase Agreement, CashCall is entitled to the $6,000,000 of Collateral owed to it under the terms therein.

53. As of the date of this Complaint, the Note Purchase Agreement is in effect, and, as set forth above, CashCall has not defaulted under the terms of the Note Purchase Agreement or any related agreement.

54. Without the declaration sought herein, the position taken by CIGPF will lead to Plaintiffs being irreparably harmed as set forth above. (*See* ¶ 39, *supra*.)

55. Accordingly, there is an actual, justiciable controversy between Plaintiffs and CIGPF with regard to CashCall's default status under the terms of the Note Purchase Agreement such that the need for declaratory judgment here is, thus, immediate and real.

56. Plaintiffs therefore request a declaration that CashCall is not in default under the terms of the Note Purchase Agreement, and accordingly, CashCall is owed the $6,063,000 wrongly appropriated by CIGPF. Plaintiffs further request a declaration that because CashCall is not in default, CIGPF has no rights or remedies which they can pursue under the Guaranty against Reddam.

## COUNT IV

### (SLANDER)

57. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-57 above, as if set forth fully herein.

58. CIGPF, through its agent Ari Rosenberg, made numerous false and defamatory statements about CashCall and the state of its business.

59. As set forth above, those statements were made on various dates, including August 6, 2007, August 7, 2007, and August 15, 2007, to various individuals at The Patriot Group, LLC, SageCrest Holdings Limited, Morgan Stanley Asset Funding Inc. and Capital Source Finance LLC.

60. CIGPF's false and defamatory statements have damaged Plaintiffs in an amount to be determined at trial, but in any event not less than $6,063,000, plus statutory interest and attorney's fees.

**WHEREFORE**, CashCall, Inc. and Dr. J. Paul Reddam demand judgment against Defendant CIGPF I Corp. as follows:

a) compensatory damages in an amount to be determined at trial of up to $600 million, but in any event not less than $6,063,000, plus statutory interest;

b) a declaration that CashCall, Inc. is not, and has never been, in default of terms of the Note Purchase Agreement, and accordingly, that CashCall is owed the $6,063,000 wrongly appropriated by CIGPF;

c) a further declaration that because CashCall is not in default, CIGPF has no rights or remedies which they can pursue under the Guaranty against Reddam; and

d) such other and further relief as the Court deems just and proper, including an award of costs and reasonable attorneys' fees.

Dated: New York, New York
August 16, 2007

SCHINDLER COHEN & HOCHMAN LLP

By: _____
Howard A. Fischer (HF 8582)
Daniel E. Shaw (DS 8129)
Matthew A. Katz (MK 4252)

100 Wall Street, 15th Floor
New York, New York  10005
Tel:  (212) 277-6300
Fax:  (212) 277-6333

*Attorneys for Plaintiffs CashCall, Inc. and Dr. J. Paul Reddam*